## Case No. 14,694a.

### UNITED STATES v. BURR et al.[1]

[Coombs' Trial of Aaron Burr. 377.]

Circuit Court, D. Virginia. Oct. 20, 1807.

TREASON—INTENT IN ASSEMBLAGE—PROOF OF OBJECT—INCIDENTAL TREASON — UNCOMMUNICATED INTENT OF LEADER — MILITARY EXPEDITION AGAINST NATION AT PEACE — HOSTILE ACT AS EXCUSE — PRELIMINARY EXAMINATION OF ACCUSED—PROVINCE OF COURT—PLEA AUTREFOIS ACQUIT.

[1. The question raised by a defense made in the nature of a plea autrefois acquit will not be determined on a preliminary examination to commit a person for high treason.]

[2. While war may be levied without a battle, or the actual application of force to the object on which it was designed to act, and a body of men assembled for the purpose of war, and being in a posture of war, do in fact levy war, the intent is an indispensable ingredient in the composition of the fact; and, if it is charged that war was levied without striking the blow, the intention to strike must be plainly proved.]

[3. Quaere, whether, after proving a connection for some general object between persons accused of treason in levying war, the conversations of one with third persons may be given in evidence against the other to prove what that object was.]

[4. The fact that treason might incidentally arise in the attempt to embark troops against a foreign nation with which the United States are at peace, will not infect a previous assemblage of troops, where the treason was neither committed nor intended.]

[5. Either acts of hostility and resistance to the government, or a hostile intention in the body assembled, are necessary to convert a meeting of men with ordinary appearances into an act of levying war. A treasonable intent on the part of the leader or person who convened the assemblage, uncommunicated to the assemblage, is not sufficient.]

[6. A citizen cannot make the election, or anticipate his government's making the election, to consider as an act of war the taking possession by another nation of contested territory, arising out of a dispute as to boundaries.]

[7. The setting on foot or providing the means of a military expedition against a nation with which the United States are at peace is an offense notwithstanding it appear that war is inevitable, unless the prosecution of the expedition depended upon its taking place.]

[8. The question whether a military expedition against a nation with which the United States were at peace was really to depend upon war being declared will not be determined upon a preliminary examination.]

[At law. On motion for commitment of Aaron Burr and Harman Blennerhassett to another district for trial for treason.]

Immediately after the return of the verdict, on the indictment for a misdemeanor [Case No. 14,694], Mr. Hay announced that it was his intention "to move for the commitment of Aaron Burr to that place for trial where the military expedition is said to have been completed;" and that he should combine in the same motion Israel Smith and Harman Blennerhassett, entering a nolle prosequi as to their trials for misdemeanor.

[1] [For references to the various cases in this series, which, together, embrace a full report of the entire proceedings against Aaron Burr, see footnote to Case No. 14,692a.]

Mr. Burr requested him to allege the place where the act was said to have been committed.

Mr. Hay replied that the evidence which he should introduce would cover a vast extent of territory; that he would name, if he could, the very spot.

Mr. Burr demanded the district, then.

Mr. Hay was not prepared to specify the district.

Wednesday, September 16, 1807.

Mr. Burr insisted on his right to a separate examination, and to demand a specification of the charges intended to be laid.

MARSHALL, Chief Justice, overruled the motion for a separate examination, but decided that a specification in writing was necessary.

Mr. Hay then produced a paper, charging Aaron Burr, Harman Blennerhassett and Israel Smith with treason, in levying war against the United States; and "that an overt act of levying war was committed on an island, whose name is not known, at the mouth of the Cumberland river, in the state of Kentucky; and that other overt acts of levying war were committed at Bayou Pierre, in the Mississippi territory, and on the Mississippi river between the places above named."

Mr. Hay then called a witness to the stand, but had not proceeded far in his examination before the counsel for the defence interposed two objections, viz: 1st. That no evidence was admissible of acts done in the Mississippi territory, because the court had no power to commit for trial in a territory. 2d. That no evidence was admissible as against Colonel Burr alone, because he had been tried by a jury and acquitted, in a former prosecution, on the same charge. On these propositions a protracted discussion ensued.

The CHIEF JUSTICE decided that under the law he had no power to commit for trial in a territory, and, therefore, could not receive evidence of acts done in a territory. On the plea of autrefois acquit he reserved his opinion, but decided to hear the evidence. He subsequently decided to admit the evidence of acts done in the Mississippi territory, "in the expectation that it might serve to explain the meeting at the mouth of the Cumberland, and because it was believed to be proper for an examining magistrate to receive it."

The counsel for the prosecution then proceeded with their testimony. The door was thrown wide open, and nearly everything offered was received, subject to future objection if it should appear not to be relevant to the charges under investigation. The examination of the evidence, with the discussions that arose from time to time as it progressed, occupied the court until the 20th of October. Considering the great length of time consumed in the examination, an astonishingly small amount of additional light was thrown upon the transactions under investigation. General Wilkinson was examined and cross-examined at very great length, and the object of a large portion of the testimony introduced by the defence was to impeach his credibility. To this end much evidence was presented tending to prove his knowledge of and connection with Burr's projected expedition against Mexico, and thereby to contradict his testimony on that subject. In fact, the investigation assumed the appearance of being as much a trial of Wilkinson as of the defendants against whom the charges were pending.

On the 20th of October Chief Justice MARSHALL delivered an opinion of which the following is a copy, except some preliminary remarks on the powers and duties of a judge sitting as an examining magistrate, which are omitted:

The charges against the accused are: 1st, that they have levied war against the United States at the mouth of Cumberland river, in Kentucky; and, 2dly, that they have begun and provided the means for a military expedition against a nation with which the United States were at peace.

With respect to one of the accused, a preliminary defence is made in the nature of a plea of autrefois acquit. If the question raised by this defence was one on which my judgment was completely formed in favor of the person by whom it is made, it would certainly be improper for me to commit him; but if my judgment is not absolutely and decidedly formed upon it, there would be a manifest impropriety in undertaking now to determine it. This does not arise from any fear to meet a great question whenever my situation shall require me to meet it, but from a belief that I ought as well to avoid the intrusion of my opinions on my brethren in cases where duty does not enjoin it on me to give them, as the withholding of those opinions where my situation may demand them. The question whether autrefois acquit will be a good plea in this case is of great magnitude, and ought to be settled by the united wisdom of all the judges. Were it brought before me on a trial in chief, I would, if in my power, carry it before the supreme court. When brought before me merely as an examining magistrate, I should deem myself inexcusable were I to decide, while a single doubt remained respecting the correctness of that decision.

To settle new and important questions in our Criminal Code, especially where those questions are constitutional, is a task upon which a single judge will at any time enter with reluctance; certainly, he would not willingly engage in it while acting as an examining magistrate. There is a decent fitness which all must feel in bringing such questions, if practicable, before all the judges. In England, trials which are expected to involve questions of great magnitude are seldom assigned to one or two judges. At that interesting crisis when Hardy, Tooke, Thelwall, and others were indicted for treason, Chief Justice Eyre was aided and supported by four associate judges of high talents and character. It would, I have

no doubt, in that country be a matter of surprise if any person, whatever might be his station in the judiciary, should undertake to settle a great and novel point on a question of commitment. Although, in the United States, our system does not admit of a commission authorizing a majority of the judges to constitute a court for the trial of special criminal cases, yet it does admit of carrying a doubtful and important point before the supreme court, and I should not feel myself justified were I now to give an opinion anticipating such a measure. I shall therefore consider this motion as if no verdict had been rendered for either of the parties.

Both charges are supported by the same transaction and the same testimony. The assemblage at the mouth of Cumberland is considered as an act of levying war against the United States, and as a military armament collected for the invasion of a neighboring power with whom the United States were at peace. From the evidence which details that transaction, it appears that from sixty to one hundred men, who were collected from the upper parts of the Ohio under the direction of Tyler and Floyd, had descended the river and reached the mouth of Cumberland about the 25th of December, 1806. The next day they went on shore, and formed a line, represented by some as somewhat circular, to receive Colonel Burr, who was introduced to them, and who said that he had intended to impart something to them, or that he had intended to communicate his views, but that reasons of his own had induced him to postpone this communication; or, as others say, that there were then too many bystanders to admit of a communication of his objects. The men assembled at the mouth of Cumberland appear to have considered Colonel Burr as their chief. Whatever might be the point towards which they were moving, they seem to have looked upon him as their conductor. They demeaned themselves in a peaceable and orderly manner. No act of violence was committed, nor was any outrage on the laws practiced. There was no act of disobedience to the civil authority, nor were there any military appearances. There were some arms, and some boxes which might or might not contain arms. There were also some implements of husbandry, but they were purchased at the place. These men assembled under contracts to settle a tract of country on the Red river. No hostile objects were avowed; and, after continuing a day or two on an island in the mouth of the river, the party proceeded down the Ohio. There are some circumstances in this transaction which are calculated to excite attention and to awaken suspicion. If the exclusive object of those who composed this meeting was to settle lands, it would naturally form the subject of public conversation, and there would most probably have been no impediment to a free communication respecting it. The course of the human mind would naturally lead to such communications. The silence observed by the leaders on this subject, connected with hints of ulterior views, seemed calculated to impress on the minds of the people themselves that some other project was contemplated, and was probably designed to make that impression. That the men should have been armed with rifles was to be expected, had their single object been to plant themselves in the Wachita; but the musket and bayonet are, perhaps, not the species of arms which are most usually found in our frontier settlements; nor were the individuals who were assembled of that description of persons who would most naturally be employed for such a purpose. The engagement for six months, too, is a stipulation for which it is difficult to account upon the principle that a settlement of lands was the sole or principal object in contemplation. These are circumstances which excite suspicion. How far they may be accounted for by saying that ulterior eventual objects were entertained, and that the event on which those objects depended was believed to be certain or nearly certain, I need not determine; but I can scarcely suppose it possible that it would be contended by any person that the transactions at the mouth of Cumberland do, in themselves, amount to an act of levying war. There was neither an act of hostility committed, nor any intention to commit such act avowed.

Very early in the proceedings which preceded this motion, I declared the opinion that war might be levied without a battle, or the actual application of force to the object on which it was designed to act; that a body of men assembled for the purpose of war, and being in a posture of war, do levy war: and from that opinion I have certainly felt no disposition to recede. But the intention is an indispensable ingredient in the composition of the fact; and if war may be levied without striking the blow, the intention to strike must be plainly proved. To prove this intention, the prosecutor for the United States offers evidence of conversations held by the accused, or some of them, with various individuals, at different times, relative to the views which were entertained, and the plans which had been formed, and of certain facts which took place after leaving the mouth of Cumberland. For although it was decided not to be within the power of this court to commit for trial in a territory of the United States, yet every transaction within a territory has been given in evidence in the expectation that such testimony might serve to explain the meeting at the mouth of Cumberland, and because it was believed to be proper for an examining magistrate to receive it.

That conversations or actions at a different time and place might be given in evidence as corroborative of the overt act of levying war, after that had been proved in such a manner as to be left to a jury, I never doubted for an instant. But that in a case where the intent could not be inferred from the fact, and was not proved by declarations connected with the fact, among which I should include

the terms under which those who composed the assemblage were convened together, this defect could be entirely supplied by extrinsic testimony, not applying the intent conclusively to the particular fact, is a point on which I have entertained doubts which are not yet entirely removed. The opinion of Judge Iredell in the Case of Fries [Case No. 5,126], according to my understanding of it when read at the bar, appears to bear strongly on this point, and that opinion would be conclusive with me, at least while acting as an examining magistrate. I have not reviewed it particularly, because my decision will not depend on the propriety of admitting this mode of proving the intent. It has, also, been made a question, whether after proving a connection between the accused for some general object, the conversations of one of them may be given in evidence against any other than himself for the purpose of proving what that object was. On the part of the United States it is insisted that such conversations may be given in evidence on an indictment for treason in levying war. By the defence it is contended that such evidence is only admissible on indictments for a conspiracy, or on indictments where a conspiracy may be laid as an overt act.

The principle that one man shall not be criminated by the declarations of another, not assented to by him, nor made in due course of law, constitutes a rule of evidence which ought not unreflectingly to be invaded. It is one of those principles on which I do not think myself required to decide, because I am not sure that its decision, however interesting it might be on a trial in chief, would essentially affect the question of commitment, nor am I confident that its decision as argued on the part of the United States would introduce the testimony it was designed to introduce. In the English books generally, the position that the declarations of a person not on trial may be given in evidence against a man proved to have been connected with him, is laid down only in cases of conspiracy, where the crime is completed without any other open deed. The position is certainly not laid down with respect to such cases, in terms which exclude its application to others, but it is not laid down in general terms, and is affirmed to apply to those particular cases, without being affirmed to apply to others. From this general observation relative to the English books, East is to be excepted. He states the proposition generally. Yet it may well be doubted whether this general statement was not with a view to the law in that treason which, in England, almost swallows up every other.

But admitting the law to be the same in treason by levying war as in cases of conspiracy, how far does it extend? The doctrine on this subject was reviewed in the Case of Hardy and Tooke [unreported]. On the part of the crown, a letter of Thelwall containing seditious songs composed by himself, and sung in the society, was offered as evidence against Hardy, who was connected with Thelwall. This testimony was rejected, because it was not a part of the transaction itself, but an account of that transaction given by Thelwall to a person not engaged in the conspiracy. The court was divided, three for rejecting and two for admitting the evidence. A letter addressed by one conspirator to another, but not proved to have been received, was then offered and admitted against the opinion of the chief justice, who thought that such a letter did not amount to an act done which might be evidence, but only to a relation of that act, which could not be evidence. He was overruled, because a letter from one conspirator to another on the conspiracy was a complete act in that conspirator. The next paper offered was a letter from a society in the conspiracy, which was found in the possession of one of the conspirators, and this was unanimously admitted.

The principle which appears to be established by these decisions is, that a letter from one conspirator to another on the subject of the conspiracy is evidence against all, but that a letter from a conspirator to a person not connected with him, stating facts relative to the conspiracy, is only evidence against himself. How far a conversation held with a stranger for the purpose of bringing him into the plot may be considered as a transaction, and, therefore, testimony to show the general conspiracy, does not appear from these decisions. This species of evidence is received to show the general object of the conspiracy, but can affect no individual further than his assent to that object can be proved by such testimony as is admissible in ordinary cases. I notice this point for the purpose of observing that I do not decide it on the present motion.

The first question which arises on the evidence is: With what objects did those men convene who assembled at the mouth of Cumberland? Was it to separate the Western from the Eastern states by seizing and holding New Orleans? Was it to carry on an expedition against Mexico, making the embarkation at New Orleans? Was this expedition to depend on a war with Spain? The conversation held by Colonel Burr with Commodore Decatur stated his object to be an expedition against Mexico, which would be undertaken, as the commodore understood, with the approbation of government in the event of war. To General Eaton, he unfolded, in his various conversations, plans for invading Mexico, and also for severing the Western from the Atlantic states. To Commodore Truxton, he spoke of the invasion and conquest of Mexico in the event of a war, as a plan which he had digested in concert with General Wilkinson, and into which he was extremely desirous to draw the commodore. A circumstance is narrated by this

witness which has been noticed by the counsel for the United States, and deserves consideration. It is the declaration of Colonel Burr that he was about to despatch two couriers with letters to General Wilkinson relative to the expedition. It was at this time that Messrs. Bollman and Swartwout are said to have left Philadelphia,--carrying each a copy of the ciphered letter which has constituted so important a document in the various motions that have been made on this occasion. This letter, though expressed in terms of some ambiguity, has been understood by the supreme court, and is understood by me, to relate to a military expedition against the territories of a foreign prince. In this sense the testimony offered on the part of the United States shows it to have been also understood by Bollman, by Swartwout, and by General Wilkinson. The inference is very strong that this letter is the same to which Colonel Burr alluded in his conversation with Commodore Truxton, and strengthens the idea that the accused gave to that gentleman a true statement of the real object, so far at least as relates to the point against which his preparations were to be directed. All the conversation relative to an expedition by sea would be equally inapplicable to any attempt on the territories of the United States and to the settlement of lands. His conversations with the Messrs. Morgan certainly indicate that his mind was strongly directed to military objects, that he was not friendly to the present administration, and that he contemplated a separation of the Union as an event which would take place at no very distant day. His conversation with Lieutenant Jackson points in express terms to hostility against Spain. The conversations of Mr. Blennerhassett evince dispositions unfriendly to the Union, and his writings are obviously intended to disaffect the Western people, and to excite in their bosoms strong prejudices against their Atlantic brethren. That the object of these writings was to prepare the Western states for a dismemberment is apparent on the face of them, and was frequently avowed by himself. In a conversation with the Messrs. Henderson, which derives additional importance from the solemnity with which his communications were made, he laid open a plan for dismembering the Union, under the auspices of Mr. Burr. To others, at subsequent times, he spoke of the invasion of Mexico as the particular object to which the preparations then making were directed. In all those whom he sought to engage in the expedition, the idea was excited that, though the Wachita was its avowed object, it covered something more splendid, and the allusions to Mexico, when not direct, were scarcely to be misunderstood. The language of Comfort Tyler also tends to prove that the enterprise was destined against Mexico. The communications made to Gen. Wilkinson deserve much consideration in marking the real intention of the parties, because it is obvious that Colonel Burr, whether with or without reason, calculated on his co-operation, with the army which he commanded, and that on this co-operation the execution of his plan greatly, if not absolutely, depended. To General Wilkinson both the ciphered letter and the explanations made by Bollman and Swartwout declared the expedition to be military and to be intended against Mexico.

I do not think the authenticity of this letter can now be questioned. When to the circumstances enumerated by the counsel on the part of the United States are added the testimony of Mr. Swartwout, and its being written in a cipher previously established between General Wilkinson and Colonel Burr, I think it sufficiently proved, at least for the present, although not in the hand-writing of the person to whom it is ascribed. The conversation stated by Gen. Wilkinson as passing between Mr. Swartwout and himself, so far as it is contradicted by that gentleman, cannot affect Mr. Burr, for this plain reason: the person alleged to have made those declarations avers not only that he never made them, but that he was never authorized to make them; that he never heard from Mr. Burr any sentiment indicating designs against any part of the United States, and never even suspected him of such designs. If, then, Gen. Wilkinson be correct, I must consider the observations he narrates as the conjectures of Mr. Swartwout, not authorized by Mr. Burr.

It is also a circumstance of some weight, that Mr. Burr's declarations at the mouth of Cumberland furnish strong reasons for the opinion that he did not wish those to whom he addressed himself to consider the Wachita as his real ultimate object, and the reference to further information from their particular leaders would naturally induce the expectation that without any open avowal their minds would be gradually conducted to the point to which their assent was to be obtained. We find there were rumors among them of attacking Baton Rouge, of attacking other parts of the Spanish dominions, but not a suggestion was heard of hostility against the United States.

On comparing the testimony adduced by the United States with itself, this is observable. That which relates to treason indicates the general design, while that which relates to misdemeanor points to the particular expedition which was actually commenced. Weighing the whole of this testimony, it appears to me to preponderate in favor of the opinion that the enterprise was really designed against Mexico.

But there is strong reason to suppose that the embarkation was to be made at New Orleans, and this, it is said, could not take place without subverting for a time the government of the territory, which, it is alleged, would be treason. The supreme court has said that to revolutionize a territory by force,

although merely as a step to or a means of executing some greater projects is treason. But an embarkation of troops against a foreign country may be made without revolutionizing the government of the place, and without subverting the legitimate authority. It is true that violence might probably result from such an attempt, and treason might be the consequence of its execution; but this treason would arise incidentally, and would not be the direct object for which the men originally assembled. This treason would attach to those who committed it, but would not, I am inclined to think, infect a previous assemblage convened for a distinct purpose. If the object of the assemblage at the mouth of Cumberland was to embark at New Orleans for the purpose of invading Mexico, the law relative to that assemblage would be essentially different from what it might be if their direct object was to subvert the government of New Orleans by force. If, in prosecuting their purpose at New Orleans, war should be levied, this would be treason at New Orleans when the fact was committed, but it could not, I think, be said to be treason by levying war at the mouth of Cumberland, where the fact was neither committed nor intended. It might be otherwise, if at the mouth of Cumberland the determination to subvert the government of a territory by force had been formed.

This opinion may be in some degree illustrated by the doctrine of the English books. Levying of war is an overt act of compassing the king's death. So is a conspiracy to levy war, provided the conspiracy be direct against the king or his government. But if it be a conspiracy to do an act of constructive treason, which act, if done, would support an indictment for compassing the king's death, the conspiracy without the act will not support the indictment. So, in this case, if the object be embarkation of a body of men against a foreign country, in the execution of which war may or may not be levied, the fact becomes necessary to constitute the treason.

It is also a circumstance of considerable weight with me that the proof exhibited by the United States to establish a general design to dismember the Union applies only to Colonel Burr and Mr. Blennerhassett. It is not proved to have been ever communicated even to Tyler or Floyd. There is not only a failure to prove that such a design was communicated to, or even entertained by the men who were assembled at the mouth of Cumberland; but the contrary is in full evidence. The United States have adduced several witnesses belonging to that assemblage, who concur in declaring that they heard nothing, that they suspected nothing, and that they would have executed nothing hostile to the United States. This testimony cannot be disregarded, for it is uncontradicted, and is offered by the prosecution. How, then, can this assemblage be said to have levied war against the United States?

Had Burr and Blennerhassett constituted this meeting, no man could have construed it into an act of levying war, whatever might have been their purpose. Their being joined by others having no hostile intentions against the United States, who were attached to them with other views, and who would not permit themselves to be employed in the execution of such intentions, does not seem to me to alter the case. The reason why men in a posture of war may be said to levy war before a blow is struck, is that they are ready to strike, and war consists in the various movements of a military force, as well as in actual fighting. But these men were not ready nor willing to strike, nor could their chief be ready to strike without them. He had yet to prevail upon them to come into his measures. This is not a meeting for the purpose of executing a formal design, but a meeting for the purpose of forming a design. It is, therefore, more in the nature of conspiracy than actual war.

Suppose Mr. Burr had, at the mouth of Cumberland, declared his object to be to seize upon New Orleans and dismember the Union, and that upon this declaration his men had universally abandoned him, could this have been denominated an act of levying war? If we forget the constitution and laws of our country, if we suppose treason, like moral guilt, to consist in the intention, and that it may be legally evidenced by the words declaring that intention, the answer to this question may be in the affirmative; but it can only consist in an open deed of levying war. I confess myself unable to perceive how such a proposition can be construed into such a deed.

The case does not appear to me to be essentially varied by the circumstance that this design was not avowed, and that the men followed Colonel Burr with other views. Upon general principles, it appears to me that unless some act be committed from which a treasonable intent may be inferred, that the treasonable intent must be proved in the assemblage, where that assemblage is composed of free agents, as well as in the person who convenes them, before the law considers war as being actually levied.

This opinion is supposed to be contrary to the decision in the Cases of the Earls of Essex and Southampton [1 How. St. Tr. 1333]. I have examined that case as reported in the State Trials, and do not think it in any respect contradictory to the ideas I have delivered. The design of the Earl of Essex was to force his way into the palace, and to remove certain counsellors from the queen, who were his enemies; but he intended no hurt to the person of the queen. For the purpose of executing this design, he assembled a large body of armed men at his own house, who continued embodied after being ordered by the proper authority to disperse, and he also entered the city of London for the purpose of raising the citizens, in order further to aid him in the execution of his plan. Several consultations had been previously held at which the Earl of Southampton assisted, and it is

not alleged in the case that he was not fully informed of these projects. He believed that no design was entertained against the person of the queen, and therefore that his acts were not treasonable;· but in the law he was mistaken. In fact, no particular design against her person was entertained, and Essex as little suspected as Southampton that they were committing treason. They were ignorant that the law pronounced those facts to be treason, but they were neither ignorant of the facts themselves nor of the real intention with which those facts were committed.

In this case the judges delivered their opinion of the law on two points. The one, "that in case where a subject attempteth to put himself into such strength as the king should not be able to resist him, and to force and compel the king to govern otherwise than according to his own royal authority and direction, it is manifest rebellion." The other, "that in every rebellion the law intendeth as a consequent the compassing the death and deprivation of the king, as foreseeing that the rebel will never suffer that king to live or reign who might punish or take revenge of his treason or rebellion."

Under this law-opinion of the judges, Essex and Southampton, were condemned and executed. The only difference between them was, that the quarrel was the quarrel of Essex, and Southampton only adhered to him, but he adhered to him knowing what he did, and the intention with which he acted.

Believing, then, the weight of testimony to be in favor of the opinion that the real and direct object of the expedition was Mexico, and inclining, also, to the opinion that, in law, either acts of hostility and resistance to the government, or a hostile intention in the body assembled, is necessary to convert a meeting of men with ordinary appearances into an act of levying war, it would, in my judgment, be improper in me to commit the accused on the charge of treason.

It is contended that they are not guilty of a misdemeanor, on one of these grounds:· Either the United States were actually at war with Spain, or the expedition was dependent on war, and, in the event of peace, was to be converted into a settlement on the Wachita. It is alleged that we were at war with Spain, because a Spanish army had crossed the Sabine, and entered the territory of the United States. That a nation may be put in a state of war by the unequivocal aggressions of others, without any act of its own, is a proposition which I am not disposed to controvert, but I cannot concede this to be such an act. The boundaries claimed by the United States to their recent purchase of Louisiana are contested by Spain. Now, if either nation takes possession of the contested territory as its own, it is an act which the opposite government may elect to consider either as an act of war or otherwise, and only the government can make that election. No citizen is at liberty to make it, or to anticipate his government. But it. is alleged that war, if not absolutely made, appeared to be inevitable, and that the prosecution of the expedition depended on its taking place. That the probability of war was great may be admitted, and this may extenuate the offence; but it still remains an offence which is punishable by law. If the expedition was really eventual, and was not to take place· in the time of peace, then, certainly, preparations might be made for it without infracting any law; but this is a fact proper for the exclusive consideration of the jury, and I shall make no comment upon it which might, the one way or the· other, influence their judgment.

I shall commit Aaron Burr and Harman Blennerhassett for preparing and providing the means for a military expedition against the territories of a foreign prince, with whom the United States were at peace. If those whose province and duty it is to prosecute offenders against the laws of the United States shall be of opinion that a crime of a deeper dye has been committed, it is at their choice to act in conformity with that opinion.

Israel Smith is not proved to have provided or prepared any means whatever, and therefore I shall not commit him. If he has really offended against the laws, he may be prosecuted for the treason in Kentucky, or for the misdemeanor in his own state, where (if anywhere) his offence has been committed.

After the delivery of the opinion of the court, the CHIEF JUSTICE observed that he had not specified (in that opinion) the particular district to which the defendants were to be committed. He thought it best that there should be only one trial for them; but if Burr was sent to Kentucky, Blennerhassett could not be, because he had provided no means for the expedition but in the district of Ohio.

Mr. Hay then moved for their commitment to Ohio, which was ordered.

Messrs. Burr and Blennerhassett were admitted to bail, in the sum of three thousand dollars each. Luther Martin and Dr. Cummings, securities for A. Burr; Dr. Cummings and Israel Smith, for H. Blennerhassett.

The court then adjourned.